IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DONALD PAUL DRINKA,

            Plaintiff,

v.

ANDREW M. SAUL,
Commissioner of Social Security,

            Defendant.

OPINION AND ORDER

19-cv-19-wmc

Plaintiff Donald Drinka seeks judicial review of a final decision by defendant Andrew M. Saul, Commissioner of Social Security, finding that he was not disabled within the meaning of the Social Security Act. Plaintiff argues that: (1) Administrative Law Judge ("ALJ") Ahavaha Pyrtel mischaracterized the vocational expert's ("VE") testimony in her written decision; and (2) the ALJ's formulation of Drinka's residual functional capacity ("RFC") was not supported by substantial evidence. The court held oral argument on this case on January 16, 2020, at which both parties appeared by counsel. For the reasons set forth below, the court will affirm in part and reverse and remand in part the commissioner's decision.

BACKGROUND[1]

On May 5, 2014, plaintiff Drinka applied for disability insurance benefits, alleging a period of disability beginning on November 30, 2013. His application was denied initially and upon reconsideration. Drinka then filed a timely request for a hearing, which

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #7.

was held on June 29, 2017.  ALJ Pyrtel issued a written decision denying Drinka's claim on November 22, 2017.  Drinka has appealed this decision under 42 U.S.C. § 405(g).

A. **Medical Record**

The medical record shows that Drinka suffers from numerous impairments.  Because plaintiff's appeal only challenges the ALJ's assessment of Drinka's right-shoulder, hearing and vision impairments, the court will limit its discussion to those conditions.

1. **Right-shoulder impairments**

In November of 2013, plaintiff injured his right shoulder pulling himself up into a milk truck.  X-rays taken later that month showed "degenerative change of the acromioclavicular joint with no acute fracture or dislocation."  (AR at 1045.)  Approximately two months later, in January of 2014, an MRI also revealed various abnormalities in Drinka's right shoulder.  (AR at 417-48.)  On April 29, 2014, Drinka underwent a right shoulder arthroscopic procedure performed by Dr. Eric Thiel.  (AR at 408-11.)  In a follow-up appointment with Dr. Thiel approximately one month after the shoulder procedure, Drinka reported that he continued to experience some pain, but ultimately Dr. Thiel cleared him to return to full capacity work as a truck driver with over-the-counter medications continued as needed to manage his pain.  (AR at 446-47.)

On July 14, 2014, Dr. Thiel also completed a "work restrictions" evaluation, limiting Drinka to "[e]xerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequen[tly], and/or a negligible amount of force constantly to move objects."  (AR at 426.)  Dr. Thiel completed another "work restrictions" evaluation on November 17, 2014, in which he concluded that Drinka could, without restrictions, lift floor to waist,

2

lift/carry at waist level, lift at/above shoulder level, push, pull, and reach overhead. (AR at 1090.) Further notes by Dr. Thiel dated November 18, 2014, indicate that Drinka's pain had returned "to baseline" and that he could return to work activity "as tolerated" but that he "was advised to avoid repetitive exposure to activities that cause shoulder discomfort." (AR at 1094.) In November of 2014, Drinka was also examined by state disability medical consultant Dr. Syd Foster. (AR at 107.) In this assessment, Dr. Foster concluded that Drinka was limited to occasional pushing/pulling and reaching with his right arm due to his shoulder injury. (AR at 104-05.)

Drinka continued to report pain in his right shoulder into 2015. In a pain questionnaire completed on April 17, 2015, Drinka explained that: his shoulder pain would wake him up at night; he was unable to hold things straight away from his body; and when driving, he needed to rest his right arm on an arm rest to avoid pain. (AR at 341.) During a consultative examination performed by Dr. Yana Puckett on June 27, 2015, Drinka further reported that his shoulder and back pain intensity amounted to 3/10 on the day Drinka was examined and 5-6/10 on most days; according to Drinka, this pain affected "his ability to work secondary to difficulty sitting standing, walking, lifting, bending and reaching." (AR at 659-60.) Dr. Puckett found that Drinka's right shoulder range of motion is "severely decreased at 90 degrees on abduction anterior and lateral." (AR at 665.) Finally, Dr. Puckett concluded that Drinka had no limitations on reaching, handling, feeling, or grasping and that Drinka would be able to perform such tasks frequently. (*Id.*)

3

A second state disability medical consultant, Dr. Andrew Przybyla, examined Drinka in April of 2015. (AR at 109.) Dr. Pryzbyla noted that Drinka's ability to push and/or pull was limited in his upper right extremity and that his "reaching in any direction" was also limited "right in front and/or laterally" and "right overhead." (AR at 128-29.) Similarly, Dr. Pryzbyla wrote that Drinka was "limited to occasionally reaching in any direction with his right arm." (AR at 129.) Finally, a return to work note completed by Dr. Maya Battikha, on November 3, 2017, indicates that Drinka was limited to light work -- lifting up to ten pounds frequently and up to twenty pounds occasionally. (AR at 1354.)

2.  **Hearing and vision impairments**

On November 13, 2012, Drinka went to urgent care due to "severe" ear pain. (AR at 1233.) He was treated with a bilateral ear wick and given two prescriptions for ear drops. (AR at 1233-34.) In January of 2015, Drinka again went to urgent care due to an earache. (AR at 637.) The notes from this visit indicate that Drinka had a "history of wax in his ears and needing to have his ears cleaned." (*Id.*) Physician Assistant Brent Kallembach completed an ear cleaning procedure, and amoxicillin and ear drops were prescribed for follow-up care. (AR at 637-38.)

On April 27, 2015, an audiogram screening was also completed and produced the following results:



(AR at 1107.) The medical history completed as a part of this screening also indicated that in 1993 Drinka had been "fitted" (presumably with a hearing aid), but he could not afford it. (AR at 1108.)

During Dr. Puckett's examination of Drinka in June of 2015, she similarly noted bilateral hearing impairment, which was more prominent on the left side. (AR at 661.) She further wrote that "during the exam, [Drinka] was unable to hear me and I had to repeat myself constantly because he does have hearing loss. However, he does not have a hearing aid due to the fact that he is unable to afford it." (AR at 665.) Dr. Puckett ultimately concluded that "[t]here may be some relevant communicative limitations due to decreased hearing," although she did not conduct any formal auditory testing. (*Id.*)

Finally, in his initial disability report, Drinka did not list hearing problems as an impairment preventing him from working (AR at 300), but in a subsequent report, he (1) checked off "hearing" as an "item" that was affected by his "illnesses, injuries, or

conditions" and (2) noted that he had some difficulty following spoken instructions due to his hearing loss (AR at 317).

With regard to his vision, Drinka listed "declining vision" as an impairment preventing him from working in his initial disability report (AR at 300), and in a subsequent report, he checked off "seeing" as an "item" affected by his "illnesses, injuries, or conditions" (AR at 317). A letter from Drinka's counsel also represented that Drinka's vision was too poor for him to get a full commercial driver's license, although he was permitted to drive recreationally. (AR at 357.) Still, physical exams in April of 2014 and August 2014 noted no "blurred vision, double vision, photophobia, pain, discharge and redness" in his eyes. (AR at 399, 1240.) On July 25, 2014, Drinka made an appointment with Dr. Andrew Baldus, O.D., because his old prescription glasses had not been working. (*Id.*) After conducting a comprehensive eye exam, Dr. Baldus diagnosed Drinka with various refractive disorders and wrote a care plan which included a new eyeglasses prescription and a recommendation to return for a comprehensive eye exam every year. (*Id.*)

During Dr. Puckett's consultation in June of 2015, she noted Drinka's report of a long history of lazy eye, light sensitivity, and vision problems that he said affected his ability to work. (AR at 660.) She also performed an HEENT (head, eyes, ears, nose, and throat) exam, noting a visual acuity of "20/60 left eye and 20/40 right eye with corrective lenses with intact visual fields by confrontation." (AR at 661.) Dr. Puckett found no other eye or vision abnormalities. (*Id.*)

6

Dr. G. Spitz, also performed an assessment of Drinka's vision in 2015. (AR at 125.) Dr. Spitz recorded that Drinka's best corrected visual acuity was 20/25 in his right eye and 20/50 in his left eye, and opined that there was no pathology present that would cause severe visual field loss or a visual disturbance. (AR at 126.) Finally, a HEENT exam conducted in 2017 indicated no visual difficulty. (AR at 1268.)

B. **Residual Functional Capacity Formulations**

During the hearing, ALJ Pyrtel received testimony from VE Darren Wright. She first posed the following hypothetical to VE Wright:

> Assume a hypothetical individual of claimant's age and education with claimant's past work. Further assume the individual is limited to light work, in addition the individual is limited to only occasional reaching overhead with the right and only occasional reaching in all other directions with the right. In addition the individual can climb ramps and stairs only occasionally, can never climb ladders, ropes or scaffolds, can balance occasionally, stoop, kneel occasionally, never crouch and never crawl.

(AR at 89.) Based on this hypothetical, VE Wright testified that the jobs of counter clerk, ironer, and sorter would be available. (AR at 89-90.)

For the second hypothetical, the ALJ asked VE Wright to assume the same limitation as set forth in the first hypothetical, but with the limitation that the individual would "only be able to stand a total of four hours and walk a total of four hours." (AR at 90.) With those limitations in place, the VE responded that he could "only identify one position and that would be a call-out operator." (AR at 91.)

The following exchange then occurred:

> [ALJ:] All right, and I have a third hypothetical for you to consider. In this hypothetical assume the same limitations set forth in hypothetical 1, however, in addition assume the individual would need to alternate one to two minutes of standing after every hour of sitting. . . . Can the individual perform any work in the national economy?
> [VE:] Those positions that I identified at light and the final position, call out operator, if you're alternating every 15 minutes, it wouldn't put the hypothetical individual off task or the --
> [ALJ:] Okay. All right, so the counter clerk, ironer and sorter you said are still available?
> [VE:] With that hypothetical, yes, Your Honor.

(AR at 90-91.)

### C. ALJ Decision

After the hearing, the ALJ assessed Drinka's alleged disability under the five-step sequential framework set forth in 20 C.F.R. § 404.1520. At step four, the ALJ concluded that Drinka had the following residual functional capacity:

> light work as defined in 20 CFR 404.1567(b) and can lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently. The claimant can sit for 6 hours, stand for 4 hours, and walk for 4 hours in an 8-hour workday. The claimant can occasionally reach, including overhead, with his right upper extremity. The claimant is unable to crawl, crouch, or climb ladders, ropes, or scaffolding. He can occasionally kneel, stoop, balance, and climb ramps and stairs. The claimant must be able to alternate 1 or 2 minutes of standing after being seated for 1 hour.

(AR at 20-21.)

At step five, based on her interpretation of the VE's testimony, the ALJ concluded that Drinka "would be able to perform the requirements of representative occupations such as call out operator." (AR at 29.) Because Drinka was capable of performing work that

existed in significant numbers in the national economy, the ALJ further found that he was not disabled within the meaning of the Social Security Act.

OPINION

Judicial review of a final decision by the Commissioner of Social Security is authorized by 42 U.S.C. § 405(g). An ALJ's findings of fact are considered "conclusive," so long as they are supported by "substantial evidence." § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the Commissioner's findings, the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Even when adequate evidence exists in the record to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the final conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 2006).

Plaintiff here argues that the ALJ committed reversable error when she mischaracterized the VE's testimony and improperly assessed Drinka's RFC. The court will address each argument in turn.

I. VE testimony

According to plaintiff, the ALJ erred at step five of the sequential framework by mischaracterizing the VE's testimony. (Pl.'s Br. (dkt. #10) 7.) Specifically, plaintiff contends that while the ALJ posed a number of hypotheticals to the VE during the hearing, the VE's answers to the hypotheticals do not support the ALJ's conclusion that Drinka was capable of performing the call-out operator position. (*Id.*) An assessment of plaintiff's argument turns on a comparison of the ALJ's hypotheticals posed during the hearing and the ultimate RFC she found in her written opinion.

The first hypothetical matched with the ultimate RFC, except that it did not include: (1) the limitation that Drinka could, in an eight-hour workday, sit for six hours, stand for four hours, and walk for four hours (the "sit/stand/walk limitation"); or (2) the limitation that Drinka must be able to alternate one or two minutes of standing after being seated for one hour (the "alternation limitation"). The second hypothetical added to the first hypothetical the sit/stand/walk limitation, while the third hypothetical added only the alternation limitation. Plaintiff asserts, therefore, that no one hypothetical reflected the full RFC.

Defendant argues that there was no error as the VE testified that the position of call-out operator could be performed under both hypothetical two and three.[2] According to defendant, because the two hypotheticals *combined* reflect the final RFC, the ALJ did not, as plaintiff argues, misconstrue the VE's testimony and properly concluded that Drinka could perform the position of call-out operator despite his limitations.

In contrast, plaintiff contends that the VE's testimony regarding the availability of the call-out operator position under hypothetical three was ambiguous. Specifically, plaintiff points to the following exchange between the ALJ and the VE:

> [ALJ:] Can the individual [with the limitations under hypothetical three] perform any work in the national economy?
> [VE:] Those positions that I identified at light and the final position, call out operator, if you're alternating every 15 minutes, it wouldn't put the hypothetical individual off task or the --
> [ALJ:] Okay. All right . . .

---

[2] Defendant also argues that, because plaintiff's counsel did not object to the VE's testimony at the hearing, he has waived this argument altogether. (Def.'s Opp'n (dkt. #11) 14.) For support, defendant cites to *Liskowitz v. Astrue*, 559 F.3d 736 (7th Cir. 2009), in which the plaintiff objected to a VE's testimony because the VE relied on a source -- the Occupational Employment Quarterly -- that was published by a private company. The Seventh Circuit ultimately held that the plaintiff had waived her right to challenge the VE's testimony because she first raised the objection in her reply brief and because the VE's testimony was clear and "uncontradicted." *Id.* at 744. Here, by contrast, plaintiff does not object to the foundation or content of the VE's testimony, but rather argues that the VE improperly relied on an ambiguous portion of the VE's testimony. And in a more closely related context the Seventh Circuit has held that a plaintiff does *not* waive her right to object to a VE's testimony that conflicts with the Dictionary of Occupational Titles where she fails at the hearing to raise the issue, as it is the *ALJ*'s obligation to resolve such conflicts. *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). Here, too, the ALJ was obligated to cite to substantial evidence to support her step five finding. *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008). Therefore, plaintiff did not waive his right to challenge this issue.

(AR at 91-92.)  Because the ALJ interrupted the VE before he could finish his thought, plaintiff argues that "[n]either the ALJ, nor the Government, nor Drinka, nor the Court can know how the expert was going to finish that sentence."  (Pl.'s Reply (dkt. #12) 4.) Even more specifically, because the VE never clearly testified that the position of call-out operator was available with both the sit/stand/walk and alternation limitations, plaintiff argues that the ALJ erred in finding that Drinka could perform the call-out operator position.

The regulations provide that, to support a finding of no disability, the ALJ is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's] residual functional capacity and vocational factors."  20 C.F.R. § 404.1560(c)(2).  "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated."  *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) (quoting *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008)).  In a similar case, the District Court for the Northern District of Illinois concluded that the ALJ erred by relying on a VE's "vague or ambiguous" testimony.  *Laurel C. v. Saul*, No. 18 CV 50196, 2019 WL 6327281, at *6 (N.D. Ill. Nov. 26, 2019).

Here, the court concludes that the VE's testimony was ambiguous at best.  As plaintiff rightly points out, the VE's answer to the ALJ's question regarding the availability of jobs given Drinka's alternation limitation is equivocal.  The court recognizes that, if the VE had had the opportunity to finish his answer, he likely would have confirmed that the call-out operator position *was* available under the ALJ's third hypothetical, but Drinka is

"entitled to a decision based on the record rather than on a hunch." *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995). Before relying on a VE's opinion to support her finding of employability, the ALJ must elicit straightforward testimony that the claimant could perform work existing in significant numbers in the national economy despite his limitations. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner."). Specifically here, because the call-out operator was the *only* position the ALJ found to be available given Drinka's RFC, the VE's opinion testimony should have unambiguously established that he could perform that job even with the alternation limitation. Since it did not, remand on this issue is warranted. *See Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008) ("A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated.").

## II. RFC

Plaintiff next argues that the ALJ failed to accommodate fully Drinka's right shoulder limitations, visual limitations, and hearing limitations into her ultimate RFC. An individual's RFC is the most that he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). The regulations require that an RFC be "based on all of the relevant medical and other evidence" in the record. § 404.1545(a)(3). This includes considerations of even those limitations found to be not severe at step three. SSR 96-8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). An ALJ, however, is "only

required to incorporate limitations that [were] found supported by the evidence." *Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016).

### A. Right Shoulder Limitation

According to plaintiff, one of Drinka's treating physicians, Dr. Thiel, "opined that Drinka could return to activity as tolerated but that he should avoid repetitive activities that caused shoulder discomfort." (Pl.'s Br. (dkt. #10) 9.) While conceding the ALJ addressed this recommendation, plaintiff argues that the ALJ erred in failing to state how much *weight* she afforded Dr. Thiel's opinion. (*Id.*) Moreover, although the ALJ limited Drinka to "occasional" reaching with his right arm, plaintiff further argues that this error was significant because such a limitation does not necessarily preclude *repetitive* reaching. (*Id.*)

Defendant objects to plaintiff's characterization of Dr. Thiel's statement as an "opinion" regarding plaintiff's limitations, contending instead that he merely "recommended" that Drinka should refrain from repetitive activities only *if* he experienced shoulder pain. (Def.'s Opp'n (dkt. #11) 6.) Defendant also argues that "the fact that the ALJ did not assign a specific weight to Dr. Thiel's recommendation is without consequence, as it is clear the ALJ considered all of Dr. Thiel's opinions and recommendations, alongside the other record evidence, in evaluating Plaintiff's limitations." (*Id.*)

Social Security regulations define "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R.

§ 404.1527(a)(1). Applying that definition in *Stephens v. Berryhill*, 888 F.3d 323 (7th Cir. 2018), the Seventh Circuit held that a physician's statement that the plaintiff "should not drive if he has hypersomnolence" was not a "medical opinion" under the regulations. *Id.* at 383. In contrast, in *Kaminski v. Berryhill*, 894 F.3d 870 (7th Cir. 2018), the same court construed (without discussion) a physician's statement that plaintiff "should avoid" certain activities to prevent increase risk of seizures as a medical opinion. *Id.* at 874. For her part, the ALJ seemed to consider Dr. Thiel's recommendation as an opinion, writing: "Dr. Thiel *opined* that the claimant could return to activity as tolerated, advising him to avoid repetitive activities that caused him shoulder pain." (AR at 27 (emphasis added).)

An ALJ is required to "evaluate every medical opinion" on the record. 20 C.F.R. § 404.1527(c). "While the ALJ need not articulate his reasons for rejecting every piece of evidence, he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000). *See also Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995) ("[T]he ALJ must articulate, at some minimal level, his analysis of the evidence" so that "a reviewing court [may] track the ALJ's reasoning and be assured that the ALJ considered the important evidence.").

Here, the ALJ addressed Dr. Thiel's recommendation, but did not explain what weight she gave to it or why she did not ultimately include a repetitive reaching limitation in Drinka's RFC. (*See* AR at 27.) Whether this constitutes error, however, is a close question. The court could not locate, nor did plaintiff cite to, any other evidence

15

specifically suggesting a repetitive reaching limitation.[3] Moreover, just the day before, Dr. Thiel had opined that Drinka could lift "at/above shoulder level without restrictions" and "reach overhead without restrictions." (AR at 1090.) Dr. Puckett similarly concluded that Drinka had no reaching limitations (AR at 659-65), and assessments by the two state agency physicians -- Drs. Foster and Pryzbyla -- both concurred that Drinka's right shoulder impairment limited him to occasional reaching with his right arm (AR at 104-05, 128-29). Even Dr. Thiel does not clearly state that Drinka was unable to reach repetitively, much less that he could only do so infrequently; instead, Dr. Thiel wrote that Drinka "was advised to avoid repetitive exposure to activities that cause shoulder discomfort." (AR at 1094.)

To be fair, Dr. Thiel may not have made this recommendation had he not believed that Drinka was likely to experience *some* repetitive reaching limitation, and the ALJ herself seemed to consider Dr. Thiel's statement to be an opinion. Rather than engage in conjecture, however, and because this case is being remanded on other grounds, the court simply instructs the ALJ (1) to revisit her treatment of Dr. Thiel's recommendation and (2) explain why she did not include a repetitive reaching limitation in her ultimate RFC.

---

[3] At oral argument, plaintiff's counsel also suggested that there was evidence on the record that Drinka had difficulty shifting gears while driving, which might indicate a limitation on repetitive reaching. However, the court could not locate this reference in plaintiff's briefing, the ALJ's opinion, or in the record. Although there is plenty of evidence that Drinka experienced difficulty driving, this could be for a number of possible reasons, including an inability to sit for long periods of time, vision difficulties, etc. (*See* Pl.'s Br. (dkt. #10) 4 ("At the time of the hearing, he was driving as a courier but was unable to drive out of state due to his vision problems; had almost gotten into accidents because he was unable to see the other vehicle; was unable to hear large trucks when they passed him; had difficulties getting out of his car after his shifts; and had to call 911 during one of his shifts and get stabilized at the hospital. AR. 48-49, 50-51, 68-69."). Even so, plaintiff is free to call *any* evidence as to Drinka's repetitive reaching limitation on remand.

## B. Hearing Limitation

Plaintiff next argues that the ALJ's decision not to incorporate a hearing limitation into Drinka's RFC is not supported by substantial evidence, and in particular did not properly assess Dr. Puckett's conclusions regarding Drinka's hearing impairments. In considering Drinka's hearing limitations, the ALJ cited to Dr. Puckett's assessment of Drinka. (AR at 27.) She noted that Dr. Puckett did conclude that there "may be some relevant communicative limitations due to decreased hearing," but ultimately did not give great weight to Dr. Puckett's assessment and included no hearing impairment in Drinka's RFC. (AR at 27.)

In light of this explanation, the ALJ adequately explained her assessment of Dr. Puckett's conclusions. First, Dr. Puckett's assessment is not, as plaintiff contends, a medical opinion as it did not conclusively "reflect[] a judgment about the nature and severity of the impairment." *Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018) ("[A] medical opinion is a statement that reflects a judgment about the nature and severity of the impairment."). Rather, Dr. Puckett simply noted that there "*may*" be limitations due to Drinka's hearing. (AR at 661 (emphasis added).) Moreover, even if the court were to construe Dr. Puckett's conclusion as a medical opinion, the ALJ properly assessed it pursuant to the regulations. Under 20 C.F.R. § 404.1527, the following factors are to be considered in evaluating a medical opinion: (1) whether the doctor examined the claimant; (2) whether the doctor treated the claimant; (3) whether the doctor presented evidence to support his opinion; (4) whether the doctor's opinion is consistent with the record as a whole; (5) whether the doctor is a specialist; and (6) other factors. Here, the ALJ noted

17

that: Dr. Puckett "performed a consultative examination of the claimant"; Dr. Puckett's evidence to support his conclusion was that Drinka was "unable to hear [him] and [he] had to repeat [himself] constantly" but that Dr. Puckett did not perform any formal testing; the record contained some reports of hearing limitations, but that Dr. Puckett's conclusion was "an anomaly, as other providers . . . did not indicate hearing difficulties in their progress notes"; and Dr. Puckett was not an auditory specialist. (AR at 23.) Therefore, even if Dr. Puckett's assessment is construed as a medical opinion, the ALJ considered it in accordance with the regulatory factors.

In addition to arguing that the ALJ erred in her assessment of Dr. Puckett's purported medical opinion, plaintiff also suggests that the ALJ's ultimate conclusion regarding Drinka's hearing limitation is not supported by substantial evidence on the record. Although the court recognizes that various records do support plaintiff's contention that Drinka suffered from hearing impairments (*see* AR at 1107, 661, 317) other records do not reflect hearing impairments or reflect temporary impairments caused by wax build-up that may be cured by medication or a hearing aid (*see* AR at 1233-34, 637, 1108). It is not this court's role to "reweigh the evidence or substitute our judgment for that of the ALJ." *Walker v. Berryhill*, 900 F.3d 479, 483 (7th Cir. 2018). Moreover, the ALJ cited to records referencing Drinka's hearing problems, and therefore did not ignore contradictory evidence. As such, the ALJ did not err as to this issue.

### C. Visual Limitation

Finally, plaintiff argues that the ALJ failed to properly consider Drinka's visual limitations in her RFC. According to plaintiff, an eye examination conducted in 2014

shows that Drinka's corrected near visual acuity was 20/40 in his right eye and 20/100 in his left eye. Plaintiff argues that the ALJ erred by ignoring this exam which "showed that Drinka had difficulties seeing nearby objects even with corrected vision." (Pl.'s Br. (dkt. #10) 13.) However, as defendant points out, plaintiff misinterprets the eye exam -- this "best corrected vision" was assessed using a glasses prescription that was over one year old. (AR at 437.) In fact, Drinka specifically attended the eye appointment because he complained that his prescription was no longer working for him. (*Id.*)

Moreover, Dr. Baldus, who conducted this eye exam, concluded that Drinka had normal vision with refraction and encouraged Drinka to more regularly attend eye exams to update his prescription glasses as needed. (*Id.*) In her opinion, the ALJ appropriately referenced this exam, as well other exams confirming Drinka's near- and far-sightedness, but otherwise normal visual field. (AR at 18.) The ALJ, therefore, appropriately explained her conclusion, which is supported by substantial evidence on the record.[4]

---

[4] Additionally, SSR 85-15p provides that:
> As a general rule, even if a person's visual impairment(s) were to eliminate all jobs that involve very good vision (such as working with small objects or reading small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels.

SSR 85-15p. Even if the record supported plaintiff's argument that Drinka had difficulty seeing nearby objects with corrected vision, plaintiff does not argue, nor does the record support, that plaintiff had an otherwise impaired visual field. Therefore, even accepting plaintiff's interpretation of the record, she does has not demonstrated that the ALJ committed reversable error. *See Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013) (upholding ALJ decision where claimant failed to direct the court "to any source or authority to support a contention that the effects of her vision impairments would prevent her from completing any job in the light work category") (citing SSR 85-15p).

ORDER

Accordingly, IT IS ORDERED that the decision of defendant Andrew Saul, Commissioner of Social Security, denying plaintiff Donald Drinka's application for disability benefits and supplemental security income is AFFIRMED IN PART and REVERSED and REMANDED IN PART for further proceedings consistent with this opinion.

Entered this 12th day of February, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge